IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF RYLEE Y.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RYLEE Y., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

DANIEL Y., APPELLANT, AND JULIE Y., APPELLEE AND CROSS-APPELLANT.

Filed May 12, 2020.    No. A-19-659.

Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH G. CRNKOVICH, Judge. Affirmed.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellant.

Natalie J. Killion and Michael D. McInerney, Deputy Douglas County Attorneys, for appellee State of Nebraska.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellee Julie Y.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Daniel Y. appeals and Julie Y. cross-appeals the Douglas County Separate Juvenile Court order terminating their parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and finding that termination was in their minor child's best interests. Based upon the analysis set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. Procedural Background

Daniel and Julie are the natural parents of Rylee, who was born in May 2011. On October 26, 2016, the State filed an adjudication petition alleging that Rylee, then 5 years old, was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because she lacked proper parental care by reason of fault or habits of Daniel, who had exposed her to inappropriate sexual contact and had failed to provide proper parental care, support, and/or supervision; and that Rylee's sexual knowledge is "significantly beyond" what was appropriate for a 5-year-old, all of which placed Rylee at risk of harm. In April 2017, the juvenile court adjudicated Rylee finding her to be within the meaning of § 43-247(3)(a) as it concerned Daniel because he failed to provide proper parental care, support, and/or supervision and that Rylee was at risk of harm.

The adjudication petition also alleged Rylee was within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of Julie, who allowed Rylee to be exposed to inappropriate sexual situations; failed to protect Rylee; and failed to provide proper parental care, support, and/or supervision which placed Rylee at risk of harm. In December 2016, the juvenile court adjudicated Rylee based on Julie's admissions to the allegations contained in the adjudication petition concerning her.

Also on October 26, 2016, the juvenile court entered an ex parte order for immediate custody placing Rylee in the temporary custody of the Department of Health and Human Services (DHHS). Rylee has remained in foster care since that time.

### 2. Motion to Terminate Parental Rights/Termination Hearing

On September 24, 2018, the State filed motions to terminate Julie and Daniel's parental rights alleging statutory grounds under § 43-292(2), (6), and (7) and that termination was in Rylee's best interests. The termination hearing was held in April and June 2019. The evidence presented at the hearing established that, at the time the State filed the motions to terminate parental rights, Rylee had been in out-of-home placement for 23 months. The evidence included a certified copy of the record of the case, which contained an Affidavit for Removal of Minor Child from Parental/Custodial Home. In the Affidavit, Officer Flynn asserted that during interviews conducted at Project Harmony, Rylee reported she sleeps with her father while he is naked and touches her father's "private part." Officer Flynn later interviewed Daniel, who acknowledged that he walks around the house naked and that Rylee "has touched his penis with her hands." Additional evidence was adduced from numerous witnesses including three mental health therapists: Kim Massara, Rylee's therapist who also provided family therapy; Dr. Theodore DeLaet, who performed psychosexual risk assessment on Daniel and was Daniel's psychologist; and RoxAnne Koenig, Julie's therapist; as well as two case managers assigned to this case, Lindsey Witt and Kati Caniglia.

### (a) Testimony Regarding Therapy

#### (i) Kim Massara

Massara is a therapist who works in the RSafe program which specializes in helping children and adolescents who have experienced sexual abuse or have exhibited sexual behavior

problems. Following a referral of domestic violence and sexual abuse, in December 2016, Massara became Rylee's therapist and has continued to act in that capacity up to the time of the termination hearing. During their sessions, Rylee expressed concern that Julie would be killed; that Daniel held a pillow over Rylee's face; that Daniel would walk around naked; and that Rylee was scared because she "saw things coming out of [Daniel]'s penis." Rylee also told Massara that Daniel would become "very angry a lot" and she was afraid of Daniel, which Massara found troubling because of the level of trauma Rylee had experienced. Massara also observed certain concerning behaviors by Rylee such as Rylee hiding under a chair when something was uncomfortable and that Rylee exhibited boundary issues by approaching strangers to talk to them, sit on their laps, or "be in their space." Massara diagnosed Rylee with post-traumatic stress disorder (PTSD) because Rylee was "clingy," anxious, afraid of men, and experienced nocturnal enuresis. Specific therapy goals for Rylee included helping Rylee regulate her emotions including utilizing coping skills, such as breathing and progressive muscle relaxation, visualization, and using words to communicate her feelings. Massara also helped Rylee work through her trauma by using a trauma-focused cognitive behavioral therapy workbook.

In addition to providing individual therapy for Rylee, Massara provided 18 family therapy sessions for Rylee and Julie from October 2017 through July 2018. The family therapy goals included establishing a safety plan, establishing good boundaries, and providing protective parenting. During this time, Julie made progress in connection with the safety plan by ensuring that there was adequate privacy at home; however, Massara expressed concerns about Julie not believing or trusting in Rylee's accusations about Daniel. For instance, Massara testified that "[Julie] said separately to me after Rylee had shared that she was concerned that she wanted [Julie] to protect her from [Daniel] having things come out of his penis, [Julie] said that she believed it was suntan lotion." Massara, separately noted the length of time Rylee has been in foster care, and testified that Rylee needs positive relationships and permanency.

Massara also testified regarding a June 2018 family therapy session involving Daniel and Rylee. Prior to the start of the session, Daniel became upset that he had been accused of engaging in grooming behaviors toward Rylee which concerned Massara because this indicated that Daniel failed to acknowledge why he was at the family therapy session. To help Rylee feel safe and comfortable, Massara instructed Daniel that he was not to initiate contact with Rylee during the therapy session. However, Massara related that during the session,

> we started playing the game, and then Dan[iel] touched [Rylee's] hair. And then I had reminded him of boundaries. He then picked [Rylee] up. And I said to not do that. And he said, well, I just wanted to know how much she weighed. And then we continued to play a game. And the content of the session was fine. But then as Rylee was leaving, I -- Rylee and I were going to meet for the next 15 minutes to give Dan[iel] some time to leave, and he quick grabbed [Rylee] and kissed her on the mouth.

Daniel's behaviors further concerned Massara because the issue of maintaining boundaries was a specific topic and focus of the therapy session, and Daniel had been instructed not to initiate contact with Rylee but did so anyway. After Daniel left the session, Rylee confided in Massara that she wanted Daniel's therapist and Julie present at the next session with him to better protect her.

### (ii) Dr. Theodore DeLaet

In April 2017, Dr. DeLaet performed a psychosexual risk assessment on Daniel and diagnosed him with bipolar II disorder, persistent depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, attention deficit hyperactivity disorder (ADHD), and unspecified personality disorder. Dr. DeLaet testified that Daniel consistently met with him for individual therapy on a weekly basis from September 2017 through February 2018. During therapy, Dr. DeLaet established the following goals with Daniel: (1) understanding why he was before the court; (2) understanding appropriate and legal sexual behavior; (3) building trust; and (4) being safe. Dr. DeLaet testified that the areas of focus were anger control, relationships, stress management, and calming techniques.

In March to mid-July 2018, Daniel's therapy changed to marital counseling, but Daniel stopped attending counseling from the end-of-July to August after losing financial support to attend therapy. By mid-August, Daniel met weekly with Dr. DeLaet for individual therapy until October when Daniel lost his job. In January 2019, Daniel resumed sessions with Dr. DeLaet and met seven times prior to commencement of the termination hearing. In relation to those sessions, when asked whether Daniel demonstrated an understanding as to why his family became involved with the juvenile court, Dr. DeLaet responded that Daniel had made progress in terms of where he started this process; however, Dr. DeLaet opined that Daniel is not at the point where he can "handle certain things appropriately" without further treatment. According to Dr. DeLaet, Daniel has not been discharged, either successfully or unsuccessfully, from therapy.

Dr. DeLaet testified that, although Daniel wrote a letter on February 1, 2018, in which Daniel took responsibility and recognized it was inappropriate for him to be nude in Rylee's presence, since writing that letter, Daniel told Caniglia on multiple occasions that he does not think being nude around Rylee is inappropriate, which concerned Dr. DeLaet. Dr. DeLaet also testified Daniel failed to use his anger management skills training during an October 2018 dispute with a female coworker which resulted in Daniel's termination from that employment.

### (iii) RoxAnne Koenig

Koenig became Julie's therapist in July 2017 following allegations that Daniel was sexually abusing Rylee. Koenig had 100 sessions with Julie to work on therapeutic goals including increasing Julie's capacity for protective parenting to ensure Julie could assist Rylee in Rylee's therapy and recovery. Koenig also worked with Julie on privacy rules which help parents teach their children that no one should view or touch their private parts and that children should not view or touch other people's private parts. Koenig noted Julie had made progress with the privacy rules and demonstrated application by using the practice skills, made progress with coping skills to deal with her depression, demonstrated a commitment to understanding sexual abuse by taking a sexual abuse course, and strived to maintain sobriety which is part of protective parenting.

Despite Julie's progress in the aforementioned areas, Koenig expressed reservations including that Julie has struggled to accept that inappropriate behaviors occurred between Daniel and Rylee and that Julie seemed torn between her love for Rylee and her love for Daniel, which led Julie to make choices that disregarded Rylee's concerns. For instance, Koenig expounded that Julie sent pictures of Rylee to Daniel despite a no-contact order being in place. After being confronted with the inappropriateness of the act, Julie responded that she did not consider her

actions to be problematic because Daniel and Rylee were not having direct contact. Further, Koenig described a situation where Julie served lasagna to Rylee during a supervised visitation and told Rylee that Daniel had made the lasagna which troubled Koenig because it constituted a form of indirect contact between Daniel and Rylee. Again after being confronted with the act, Julie responded that she did not consider it "that big of a deal."

Julie has also struggled to make progress with the protective parenting goal. Koenig explained that, after the May 2018 family therapy session with Daniel and Rylee, Julie would only accept a version of events related by Daniel and not Rylee's version of events. Following that family therapy session, Koenig stated that Julie expressed concern that Rylee would be taken from her and expressed that concern directly to Rylee. Koenig stated Julie's comments were inappropriate and noted during individual therapy that Julie recognized she was wrong to share that with Rylee. Koenig also expressed concerns that Julie was not consistent in advocating for herself with Daniel because she was hesitant or fearful that he would react poorly to her suggestions, and that fear of Daniel hindered her ability to act in Rylee's best interests. When asked to give her therapeutic opinion about whether Julie would be able to keep Rylee safe, Koenig responded that Julie would not be able to do so consistently and that Julie had failed to consistently demonstrate protective parenting skills.

### (b) Testimony From Case Managers

#### (i) Lindsey Witt

From approximately December 2016 through June 2017, Lindsey Witt was the case manager in this case. When Witt was first assigned the case, she met with Rylee who told her that she was afraid Daniel would come to her foster parents' home, which worried Witt because Daniel did not have visitation rights.

During Witt's tenure as case manager, due to concerns about Julie's alcoholism, Julie participated in an alcohol recovery program and Witt reported that Julie complied with the drug testing requirements. Witt stated Julie's drug tests were positive due to the medications she was taking but Julie tested negative for alcohol. Witt expressed concern that, if Rylee was returned to Julie's care, the problems and concerns in the home would continue due to Julie's failure to recognize the serious nature of the issues that brought the case before the juvenile court.

As case manager, Witt met with Daniel once per month for a total of seven meetings during which they would discuss updates and progress on court orders. During the meetings, Witt testified that Daniel exhibited intimidating behavior such as growling at her or slamming small objects on the table if he did not get his way which led Witt to bring another person to accompany her at the meetings.

#### (ii) Kati Caniglia

In June 2017, Kati Caniglia took over as case manager from Witt and she remained case manager until the time of the termination hearing.

##### a. Caniglia's Testimony Regarding Julie

Caniglia testified that Julie was not compliant with the court orders that required she maintain employment and that required she obtain and maintain safe, stable, and/or appropriate

housing. Caniglia learned Daniel paid all of Julie's expenses because she was unemployed and Julie was unable to maintain housing without Daniel's financial assistance. Further, Caniglia became concerned after she observed some of Daniel's belongings in Julie's house during a January 2019 unscheduled walk-through of Julie's house. Caniglia testified that in response to this discovery, Julie acknowledged that Daniel came to her home but denied that he lived there. This finding concerned Caniglia because Daniel had never been deemed safe or appropriate to be around Rylee. Caniglia testified Daniel was not safe to be around Rylee because

> [Daniel] never followed through with any of the therapeutic conditions that would deem that he has been rehabilitated to accept responsibility for the behaviors that brought Rylee into care and even move towards having that therapy with Rylee and rebuilding the relationship with Rylee where we would feel like she was safe to be around him.

Caniglia explained that Julie's financial dependence on Daniel and her allowing him to regularly visit her home demonstrated Julie's lack of protective parenting.

Caniglia testified that Julie also displayed inappropriate behavior during supervised visits with Rylee including screaming and yelling on the phone at Caniglia, apologizing for Daniel or rationalizing his behavior to Rylee, making negative comments about Julie's therapist, and presenting Rylee with a birthday gift from Daniel.

Caniglia also testified that Julie was also court-ordered to attend classes addressing domestic violence, RSafe, alcohol recovery, and relapse prevention. Julie did not provide proof of completion for those classes and Caniglia could not confirm Julie's commitment to the alcohol recovery program because Julie did not provide "SMART cards" on a consistent basis.

Caniglia testified that in her opinion, Julie had not made substantial lifestyle changes to be able to safely parent Rylee. Caniglia testified that, in order for reunification to occur, Julie needed to become self-sufficient in order to be able to maintain housing without being financially dependent on Daniel and to demonstrate her ability to be a protective parent. Caniglia noted that, despite working with therapists on the issue, she has not shown she can stand up to Daniel for herself, let alone stand up for Rylee. Caniglia requested family therapy cease after Dr. DeLaet informed her that Julie was sharing Rylee's thoughts from therapy which violated Rylee's boundaries and, in July 2018, the juvenile court temporarily suspended family therapy sessions between Rylee and Julie.

### b. Caniglia's Testimony Regarding Daniel

Caniglia testified that Daniel has failed to comply with court orders requiring him to obtain and maintain safe, stable, and/or appropriate housing because he reported that he lives with a friend. Daniel also failed to consistently attend therapy. Specifically, Daniel stopped attending therapy in July 2018 after the court ordered him to pay for therapy; he resumed therapy in August 2018, but quit in November after losing his employment; and he then resumed therapy again in January 2019. Although Caniglia explained to Daniel that he could receive financial assistance to pay for therapy if he provided a budget, Daniel never provided the necessary information.

Caniglia expressed concern that Daniel stopped taking one of his prescription medications because he believed he did not need it and there was no indication that Daniel had consulted a doctor before discontinuing his prescribed medication. Caniglia also expressed concern that after

attending therapy for over a year to address his sexualized behaviors around Rylee, Daniel stated to Caniglia, on multiple occasions, that he did not think his past behaviors, including being nude around Rylee, were inappropriate and he believed what he did in his home was his choice. Caniglia testified that Daniel has not made sufficient progress to warrant supervised visits or to continue additional therapeutic visits with Rylee.

Caniglia explained that, in her opinion, Daniel did not understand why his family was before the court and, despite being offered therapy, case management, and other services, Daniel had not made substantial lifestyle changes to allow him to safely parent Rylee. Further, Daniel had not rehabilitated himself because he had not accepted full responsibility for his sexualized behaviors around Rylee, had not successfully completed therapy, continued to be terminated from his employment, and had failed to obtain and maintain appropriate housing. Caniglia testified that Daniel was terminated from his employment in November 2018 after becoming involved in a verbal altercation with a female supervisor. Additionally, Caniglia testified that over a 2-year period Rylee has relayed to her on multiple occasions that Rylee was frightened by Daniel.

### c. Overall Conclusion

Based upon her training, ongoing contact with Rylee and her parents, length of time Rylee has been removed from her home, and lack of progress made on court orders, Caniglia ultimately concluded that termination of Julie and Daniel's parental rights was in Rylee's best interests.

### (c) Evidence Regarding Parties' Visitation

#### (i) Julie

From December 2016 to June 2017, Julie had supervised visits with Rylee. According to Witt, Julie did not progress to unsupervised visits because Julie failed to understand the seriousness of the issues in this case.

In June 2017, Julie was participating in fully supervised visits with Rylee. From November 2017 to July 2018, Julie had supervised visits twice per week. Two visitation workers assigned to the case during that time period described the visits. The first visitation worker, who supervised visits from November 2017 to March 2018, stated that Julie provided appropriate activities for Rylee, she never observed safety concerns during the visits, and that Rylee was excited to see Julie and would cry because she did not want to leave when the visits ended. The second visitation worker, who supervised visits from April to July 2018, testified that Julie provided age-appropriate activities for Rylee, that Rylee was happy and excited during the visits, and Rylee mentioned that she wanted to live with Julie.

In July 2018, Julie's supervised visits were decreased to once per week. A third visitation worker assigned to the case from June 2018 to the termination hearing testified that Julie provided age-appropriate activities for Rylee and Rylee was excited to see Julie. However, the visitation worker noted that Julie made critical comments about Rylee's foster parents, which was troubling.

#### (ii) Daniel

Daniel has not had visitation with Rylee since November 2016 pursuant to court order. Further, since June 2017, Daniel has not been allowed to have contact with Rylee except during one family therapy session.

### 3. JUVENILE COURT ORDER

Following the termination hearing, the juvenile court issued a short order finding the State proved, by clear and convincing evidence, that termination of Daniel and Julie's parental rights was proper pursuant to § 43-292(2), (6), and (7) and that termination was in Rylee's best interests. Daniel has timely appealed to this court and Julie has cross-appealed.

## III. ASSIGNMENTS OF ERROR

Both Daniel and Julie contend the juvenile court erred in terminating their parental rights to Rylee pursuant to § 43-292(2), (6), and (7) and in finding that termination was in Rylee's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*.

## V. ANALYSIS

### 1. STATUTORY BASIS FOR TERMINATION

In its order terminating both Daniel and Julie's parental rights to Rylee, the juvenile court found termination was supported by three separate statutory grounds: § 43-292(2) (parent has substantially and continuously or repeatedly neglected and refused to give juvenile necessary parental care and protection); § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family have failed to correct conditions leading to determination); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months). Although Daniel and Julie do not contest the juvenile court's termination of their parental rights pursuant to § 43-292(7), for completeness, we briefly address termination pursuant to § 43-292(7).

Here, Rylee was removed from Daniel and Julie's care and placed in the temporary custody of DHHS in October 26, 2016. At the time the State filed its motion to terminate on September 24, 2018, Rylee had remained in out-of-home care for almost 23 months and she has not been returned to her parents' home. Our de novo review of the record shows that grounds for termination of Daniel and Julie's parental rights under § 43-292(7) was proven by clear and convincing evidence.

We need not consider whether termination of Daniel or Julie's parental rights was proper pursuant to the other subsections of § 43-292 since any one ground of the eleven identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

### 2. BEST INTERESTS

Both Daniel and Julie argue the juvenile court erred in finding it was in Rylee's best interests to terminate their parental rights. Specifically, Daniel argues he complied with the

rehabilitation plan and made significant progress. Julie contends that the motion to terminate her rights was filed while she was trying to comply with the rehabilitation plan and making progress and that the evidence shows Rylee enjoys spending time with her.

In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

> In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

We first examine whether the record supports a finding that Daniel suffers from a personal deficiency or incapacity which has prevented or will probably prevent performance of a reasonable parental obligation in rearing Rylee and which has caused or will probably result in detriment to Rylee's well-being. We find that the record supports that finding here. Specifically, the record establishes that, in October 2016, when Rylee was only 5 years old, she was removed from her parents' home due to allegations, among others, that Daniel had exposed her to inappropriate sexual contact and that Julie had allowed Rylee to be exposed to inappropriate sexual situations. Rylee described to her therapist that Daniel would walk around naked and that she was scared because she "saw things coming out of [Daniel]'s penis." Officer Flynn reported that during interviews conducted at Project Harmony, Rylee reported that she sleeps with her father while he is naked and that she touches her father's "private part." Officer Flynn subsequently interviewed Daniel, who acknowledged he walks around the house naked and that Rylee "has touched his penis with her hands." Rylee also expressed fear that Daniel was "very angry a lot," that Daniel held a pillow over Rylee's face, and that Rylee was concerned that Daniel would kill Julie. Daniel has been diagnosed with bipolar II disorder, persistent depressive disorder, generalized anxiety

disorder, obsessive-compulsive disorder, ADHD, and unspecified personality disorder. The family's case manager, Caniglia, reported that Daniel stopped taking a prescription medication for his condition without medical authorization due to his own belief he did not need it. Despite participating in therapy with Dr. DeLaet during the pendency of this case, during a family session with Rylee in June 2018, Daniel refused to comply with certain boundary obligations established for the session which included not initiating contact with Rylee. Despite these specific instructions, Daniel touched Rylee's hair, picked her up, and kissed Rylee on the mouth causing Rylee to seek reassurance from her therapist that additional persons would be present at any further sessions with Daniel in order to better protect Rylee.

During the 23 months that Rylee has been in out-of-home care, Daniel has repeatedly stated that he does not believe being nude around Rylee is inappropriate. Further, in October 2018, Daniel failed to implement anger management skills provided to him during training which ultimately resulted in his termination from employment. Caniglia testified that she believed it was in Rylee's best interests for Daniel's parental rights to be terminated. We note that despite being offered therapy, case management, and other services, Daniel has failed to recognize and accept full responsibility for his inappropriate sexual behavior around Rylee placing Rylee at risk of harm.

Like Daniel, Julie has also failed to accept that inappropriate sexualized behaviors occurred involving Rylee and Daniel, and has failed to accept or believe what Rylee shared was happening between her and Daniel. For example, when confronted with Rylee's statement that she wanted protection from Daniel in relation to "having things come out of his penis," Julie disregarded Rylee's concerns, stating that "it was suntan lotion." Further, Julie failed to protect Rylee from Daniel throughout the pendency of this case as evidenced by her sending photos of Rylee to Daniel, giving Rylee things Daniel had purchased or made for Rylee, and overtly disregarding the court's order prohibiting Daniel from having contact with Rylee. Koenig explained that in May 2018, after the family therapy session with Daniel and Rylee, Julie only accepted Daniel's version of events and not Rylee's.

We note Julie's visits have never progressed from supervised to unsupervised because she failed to understand the seriousness of the issues in this case which caused Witt to opine that if Rylee was returned to Julie's care, the problems and concerns in the home would continue. Furthermore, Julie is unable to consistently advocate for herself with Daniel which hinders her ability to act in Rylee's best interests. Julie, who is unemployed, remains financially reliant on Daniel including for her place of residence. When asked to give her therapeutic opinion about whether Julie would be able to keep Rylee safe, Koenig opined that Julie has failed to consistently demonstrate protective parenting skills and that she would not be able to keep Rylee safe. Caniglia also testified that termination of Julie's parental rights was in Rylee's best interests.

In *In re Interest of A.B. et al.*, 236 Neb. 220, 460 N.W.2d 114 (1990), the Nebraska Supreme Court addressed a similar issue where one parent refused to accept the risk inherent in the sexualized conduct of the other to the detriment of the children. In performing the best interest analysis, the court held:

> The testimony from the caseworkers and psychologists was that the appellant's denial of her daughter's sexual abuse causes the family to be dysfunctional and that all of the children are at risk because of the appellant's behavior. No one who testified believed the children could safely be returned home in the near future or that there was much possibility

that the mother would ever comply with the plan for rehabilitation. All of the professionals were in agreement that because the appellant's denial of the sexual abuse and the other problems within the family were so deeply entrenched, it would be years before there would be any chance of the children's being returned to the appellant.

The appellant's denial that any sexual abuse had occurred prevented any plan of rehabilitation from succeeding. It is clear from the record that the appellant prefers the company of the abusive stepfather to that of her children.

*Id.* at 223-24, 460 N.W.2d at 116-17.

The same can be said here. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Rylee has been in foster care since October 2016 and deserves stability in her life and should not be suspended in foster care. Daniel is either unable or unwilling to rehabilitate himself and Julie has been unable to protect and parent Rylee. Accordingly, we find there was clear and convincing evidence to show that both Daniel and Julie are unfit and that terminating their parental rights was in Rylee's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Daniel and Julie's parental rights.

AFFIRMED.